## UNITED STATES DISTRICT COURT
## DISTRICT OF VERMONT

|  |  |
|---|---|
| TODD SEMON AND JEROME MEISTER, on behalf of themselves, and all others similarly situated,<br><br>  Plaintiffs,<br><br>  v.<br><br>ROCK OF AGES CORPORATION, SWENSON GRANITE COMPANY, LLC, GRANITE ACQUISITION, LLC, KURT M. SWENSON, JAMES L. FOX, RICHARD C. KIMBALL, DONALD LABONTE, LAURA A. PLUDE, PAMELA G. SHEIFFER, and FREDERICK E. WEBSTER JR.,<br><br>  Defendants. | Case No.  5:10cv00143-CR |

## VERIFIED AMENDED CLASS ACTION COMPLAINT

Plaintiffs, Todd Semon, and Jerome Meister, by their attorneys, allege the following upon information and belief, except for those allegations which pertain to plaintiffs, which allegations are based upon personal knowledge:

1.      This action arises out of an unlawful scheme and plan to enable Kurt M. Swenson, non-executive Chairman of Rock of Ages Corporation ("ROAC" or the "Company") and the Chairman and a director of Swenson Granite Company, LLC, his brother, Kevin Swenson, and Robert Pope ("Pope"), President and Chief Executive Officer and a director of Swenson Granite, to acquire the Company for grossly inadequate consideration and in breach of the individual defendants' fiduciary duties.  Kurt Swenson, Kevin Swenson, and Pope own approximately 31%

of all outstanding shares of common stock of Rock of Ages, and control approximately 71% of the voting power of all outstanding Rock of Ages shares.

2.      Given the years of reliance on shareholders to bear the costs of the Company's foray into retail, the restructure of the Company through its divestment of its retail operations, the upgrade of the Company's quarrying and manufacturing facilities, the recent reduction of the Company's debt and economic downturn, the scheme to take the Company private on the cheap now that ROAC's outlook is brighter is especially egregious.

3.      Execution of the scheme began at least as early as September 19, 2009, when ROAC announced its reincorporation from Delaware to Vermont by merging the Company into its wholly-owned Vermont subsidiary. According to the Proxy Statement furnished to ROAC's shareholders in connection with the vote on whether or not to approve the reincorporation, the reincorporation had the effect of making it easier for the Swenson Granite Group (defined below) to acquire the remaining shares of ROAC that it did not own, as detailed herein. Additionally, as also discussed below, the effect of said reincorporation may have been misrepresented to ROAC shareholders.

4.      On May 7, 2010, ROAC announced that its Board of Directors (the "Board") had received an unsolicited proposal from Swenson Granite Company, LLC, led by Kurt Swenson, Kevin Swenson, and Pope, as well as ROAC Board member Kimball, and then-ROAC Board member Charles Waite ("Waite"), to purchase all of the outstanding shares of the Company for $4.38 per share in cash. According to the proposal letter of May 6, 2010, the Swensons and Pope would exchange all of their Class B shares of ROAC for additional interest in Swenson.

5.      Following the announcement of the proposal, Plaintiff Semon filed a class action complaint in Vermont Superior Court, Washington County on May 19, 2010, asserting breach of fiduciary duty claims based on defendants' wrongful conduct related to the announcement of the Swenson Granite Group proposal to purchase all of the outstanding shares of the Company for $4.38 per share in cash.

6.      That complaint alleged that the proposed transaction was the product of unfair dealing, and the price of $4.38 per share was unconscionable and unfair and so grossly inadequate as to constitute a gross breach of trust committed by the management defendants participating in the proposed transaction against the Company's public stockholders.

7.      Plaintiff Semon subsequently provided a valuation and analysis, among other materials, to ROAC's advisors and Special Committee of its Board showing that the proposed $4.38 per share price substantially undervalued the Company.

8.      On October 18, 2010, ROAC announced that it had entered into a definitive merger agreement with Swenson Granite Company, LLC (the "Merger Agreement") whereby Swenson Granite Company, LLC, and its wholly owned subsidiary, Granite Acquisition, LLC (together, "Swenson Granite") will acquire 100% ownership of ROAC for $5.25 per share in cash (the "Proposed Transaction").

9.      Kurt Swenson, Kevin Swenson, Pope, Peter Friberg, a Vice President of ROAC, and certain other members of Swenson Granite who are also shareholders of ROAC ("Swenson Granite Group") have agreed, under the terms of voting agreements with Swenson Granite, to vote all of the ROAC shares they beneficially own in favor of approval of the Merger Agreement. Members of the Swenson Granite Group beneficially own, in the aggregate, 408,701 shares of Company Class A common stock and 2,449,793 shares of Company Class B

common stock, representing approximately 81% of the total voting power of all outstanding shares of ROAC's common stock.

10.     Under the terms of the voting agreements, Individual Defendants, Kurt Swenson and Richard Kimball, will receive Swenson Granite shares instead of cash, in contrast to the compensation received by ROAC's public shareholders.  Individual Defendant, Donald Labonte, will also receive the option to purchase Swenson Granite shares, and recently retired ROAC Board member, Waite (another party to the voting agreements) will also receive Swenson Granite shares instead of cash for his shares.

11.     The Proposed Transaction is unfair to the public shareholders of ROAC in both the process at which it was arrived at and the price it provides to the minority shareholders. As detailed herein, the members of the Board failed to fulfill their fiduciary duties to obtain the highest price available for the Company's public shareholders.

12.     In addition to agreeing to unfair consideration and failing to maximize value for the Company's public shareholders, the Board has also failed to disclose material information that ROAC shareholders need in order to make informed decisions as to whether to vote their shares in favor of the Proposed Transaction or not.  For example, the Board failed to disclose various details as to the background of the Proposed Transaction, primarily relating to the process that led up to the Proposed Transaction, including what strategic alternatives were examined, as well as details relating to financial projections and other analyses mentioned in the preliminary proxy statement recently filed by the Company.

13.     As a result of the Individual Defendants' failure to maximize shareholder value, their other breaches of fiduciary duty, and the other defendants aiding and abetting these breaches of fiduciary duty, plaintiffs allege that they and other public shareholders of ROAC

common stock are entitled to enjoin the Proposed Transaction or, alternatively, to rescind the Proposed Transaction, or otherwise recover damages, in the event the Proposed Transaction is consummated.

## THE PARTIES

14.     Plaintiffs, Todd Semon, and Jerome Meister ("Plaintiffs"), are, and at all relevant times were, the beneficial owners of approximately 11,700 shares of ROAC common stock, and 68,300 shares of ROAC common stock, respectively.  Plaintiffs are citizens of New Jersey and Colorado, respectively.

15.     Defendant ROAC is a Vermont corporation with its executive offices located at 560 Graniteville Road, Graniteville, Vermont 05654.  The Company's Class A Common Stock is listed on the NASDAQ Global Market under the symbol "ROAC."  ROAC purports to be the largest integrated quarrier and manufacturer of finished granite memorials and granite blocks for memorial use in North America.  According to ROAC, it owns and operates nine active quarry properties and five manufacturing and sawing facilities in North America, principally in Vermont and the Province of Quebec.  The Company sells memorials wholesale to independent authorized ROAC retailers in the United States and Canada.  As of October 29, 2010, there were 4,812,342 outstanding shares of Class A common stock and 2,603,721 outstanding shares of Class B common stock.

16.     Defendant Swenson Granite Company, LLC, is a Delaware limited liability company.  Swenson Granite is "engaged in the granite curb and landscaping business" and "could be considered" or "may be deemed and affiliate of the Company."

17.     Defendant Granite Acquisition, LLC, is a Delaware limited liability corporation and a wholly-owned subsidiary of Swenson Granite Company, LLC.

18.     Defendant Kurt M. Swenson has been the Chairman of the Board of ROAC since 1984.  From 1984 to June 30, 2008, he was President and Chief Executive Officer of the Company, and is currently the non-executive Chairman of the Board.  He is also the Chairman of Swenson Granite Company, LLC.  Kurt Swenson owns 1,135,000 shares, or 19.5% of ROAC's Class A Common Stock, and 1,005,000 shares, or 38.6% of ROAC's Class B common stock. His brother, Kevin C. Swenson, Vice President of Swenson Granite Company, LLC, owns 1,023,489 shares, or 17.5% of ROAC Class A shares, and the same number, or 39.3% of the Class B common stock. Kurt Swenson and Kevin Swenson are members of the Swenson Granite Group and have entered into a voting agreement with Swenson Granite to vote their ROAC shares in favor of the Proposed Transaction.  Kurt Swenson is a citizen of New Hampshire.

19.     Defendant Donald Labonte ("Labonte") has been a director and President and Chief Executive Officer of ROAC since 2008.  He was President and Chief Operating Officer/Quarry Division from December 2007 to February 2008, and President and Chief Operating Officer/Manufacturing Division from August 2002 to February 2008.  Labonte has also been President of Rock of Ages Canada, Inc., a wholly owned subsidiary of the Company, since 1999.  Labonte is a citizen of Canada.

20.     Defendant James L. Fox ("Fox") has been a director of the Company since October 1997.  Fox acted as the Chairman of the Special Committee of the Board, established in connection with reviewing the initially proposed transaction by the Swenson Granite Group (the "Special Committee").  Fox is a citizen of Massachusetts.

21.     Defendant Richard C. Kimball has been a director of the Company since 1986, and Vice Chairman since 1993.  Kimball is a former director of Swenson Granite and a member of the Swenson Group.  Kimball beneficially owns 72,126 shares of Class A Common Stock,

1.5% of the Class A Common Stock, and 29,126 shares, 1.1% of ROAC's Class B Common Stock.  Kimball is a citizen of New Hampshire.

22.      Defendant Laura A. Plude ("Plude") is, and all relevant times was, ROAC's Chief Financial Officer and Vice President of Finance.  She served briefly as Vice President/Finance from July 2007 to August 2007, and was Director of Finance of the Company from August 2004 to July 2007.  Plude is a citizen of Vermont.

23.      Defendant Pamela G. Sheiffer ("Sheiffer") has been a director of the Company since June 2004.  She is also a member of the Compensation and the Corporate Governance and Nominating committees, and a member of the Special Committee of the Board.  Sheiffer is a citizen of New York.

24.      Defendant Frederick E. Webster Jr., Ph.D. ("Webster") has been a director of the Company since October 1997.  Webster is a member of the Audit, Corporate Governance and Nominating and the Compensation committees, and a member of the Special Committee of the Board.  Webster is a citizen of Arizona.

25.      The above-named individual defendants (collectively the "Individual Defendants"), as officers and/or directors of the Company, owe fiduciary duties of good faith, loyalty, fair dealing, due care, and candor to Plaintiffs and the other members of the Class (as defined below).

## JURISDICTION

26.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1332(a), and (c) as Plaintiffs are citizens of States different from any defendant, this action primarily seeks injunctive relief which is equally applicable to all Class members, and the

amount in controversy with respect to Plaintiffs, if the Proposed Transaction is not enjoined and it gets consummated, exceeds $75,000, exclusive of interests and costs.

27. Venue is proper in this district pursuant to 28 U.S.C. § 1391(a) and (c). ROAC is incorporated in, and has its principal place of business in this district. Many of the acts giving rise to the allegations herein occurred in this district.

## CLASS ALLEGATIONS

28. Plaintiffs bring this action on behalf of themselves and all other stockholders of the Company and their successors in interest, who are or will be threatened with injury arising from defendants' actions as more fully described herein (the "Class"). Excluded from the Class are the defendants herein, members of their immediate families, and any subsidiary, firm, trust, corporation, or other entity related to or affiliated with any of the defendants.

29. This action is properly maintainable as a class action for the following reasons:

(a) the Class is so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, as of October 29, 2010, there were 4,812,342 outstanding shares of Class A common stock and 2,603,721 outstanding shares of class B common stock, estimated to be held by hundreds, if not thousands, of shareholders. The holders of these shares are believed to be geographically dispersed throughout the United States. ROAC common stock is listed and actively traded on the NASDAQ Global Market exchange;

(b) there are questions of law and fact which are common to members of the Class and which predominate over any questions affecting only individual members. The common questions include, *inter alia*, the following:

(i)     whether defendants have engaged and are continuing to engage in a plan and scheme to benefit the Swensons, Pope, and others at the expense of the members of the Class;

(ii)     whether the Individual Defendants, as directors and/or officers of the Company and/or as significant shareholders of the Company, have breached their fiduciary duties owed to Plaintiffs and the other members of the Class, including their duties of entire fairness, loyalty, due care, and candor;

(iii)     whether defendants have disclosed all material facts in connection with the Proposed Transaction; and

(iv)     whether Plaintiffs and the other members of the Class would be irreparably damaged were defendants not enjoined from the conduct described herein;

(c)     the claims of Plaintiffs are typical of the claims of the other members of the Class, and Plaintiffs have no interests that are adverse or antagonistic to the interests of the Class;

(d)     Plaintiffs are committed to prosecuting this action and have retained counsel competent and experienced in litigation of this nature. Plaintiffs are adequate representatives of the Class and will fairly and adequately protect the interests of the Class;

(e)     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class that would establish incompatible standards of conduct for defendants, or adjudications with respect to individual members of the Class that would

be dispositive of the interest of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; and

(f)     Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

## BACKGROUND AND SUBSTANTIVE ALLEGATIONS

30.     ROAC is a Vermont corporation founded in 1885 and is an integrated granite quarrier and manufacturer whose principal product is granite memorials used primarily in cemeteries.

31.     The Company went public in an initial public offering in 1997 at $18.50 per share. According to its Form10-K filed with the SEC for the period ended March 31, 2010, in 2007 the Board determined "to exit the retail business, to simplify and reduce the cost of the existing management infrastructure, and to focus on [the] core quarrying and manufacturing business, including [the] wholesale memorial distribution system."

**The Reincorporation**

32.     On December 8, 2009, the Company completed the change in its state of incorporation from Delaware to Vermont.

33.     In the Proxy Statement issued by ROAC in seeking shareholder approval of the reincorporation in the fall of 2009 (the "2009 Proxy"), ROAC highlighted distinctions between Delaware and Vermont law that would impact ROAC and its shareholders going forward if the shareholders voted in favor of the reincorporation. For example, the 2009 Proxy stated the following:

**Stockholder Approval of Certain Business Combinations**

*Delaware Provisions*

Section 203 of the DGCL provides that, subject to certain exceptions specified therein, *a corporation shall not engage in any "business combination" with any "interested stockholder" for a three-year period following the date that such stockholder becomes an interested stockholder.* For purposes of Section 203, the term "business combination" is defined broadly to include (i) *mergers with or caused by the interested stockholder*; (ii) sales or other dispositions to the interested stockholder (except proportionately with the corporation's other stockholders) of assets of the corporation or a subsidiary equal to ten percent or more of the aggregate market value of the corporation's consolidated assets or its outstanding stock; (iii) the issuance or transfer by the corporation or a subsidiary of stock of the corporation or such subsidiary to the interested stockholder (except for transfers in a conversion or exchange or a pro rata distribution or certain other transactions, none of which increase the interested stockholder's proportionate ownership of any class or series of the corporation's or such subsidiary's stock); or (iv) receipt by the interested stockholder (except proportionately as a stockholder), directly or indirectly, of any loans, advances, guarantees, pledges or other financial benefits provided by or through the corporation or a subsidiary.

The three-year moratorium imposed on business combinations by Section 203 of the DGCL does not apply if: (i) prior to the time on which such stockholder becomes an interested stockholder the board of directors approves either the business combination or the transaction which resulted in the person becoming an interested stockholder; (ii) the interested stockholder owns 85 percent of the corporation's voting stock upon consummation of the transaction which made him or her an interested stockholder (excluding from the 85 percent calculation shares owned by directors who are also officers of the target corporation and shares held by employee stock plans which do not permit employees to decide confidentially whether to accept a tender or exchange offer); or (iii) at or after the time on which such stockholder becomes an interested stockholder, the board approves the business combination and it is also approved at a stockholder meeting by two-thirds (66-2/3%) of the voting stock not owned by the interested stockholder.

*Id.* at p. 8 (emphasis added).

*Vermont Provisions*

*The VBCA has no such comparable provisions to Section 203 of the DGCL.* The VCBA does have a provision (Section 8.30(a)(3)) found in some other states, authorizing the board of directors to consider factors such as impacts on employees, suppliers, creditors and customers and community, the economy of the state, region and nation, and community and societal impacts, in determining the best interests of the corporation with respect to a proposed business combination.

*Id.* at p. 9 (emphasis added).

34.     Highly suspiciously, the 2009 Proxy for the reincorporation also stated:

> *The Company is not aware of any specific effort by any party to assume control of the Company. Because the VBCA does not have a provision comparable to Section 203 of the DGCL, it may be easier for certain parties who would be interested stockholders under the DGCL to engage in a business combination with the Company. No such business combinations are known to be currently contemplated.*

*Id.* at p. 9 (emphasis added).  The 2009 Proxy was signed by defendants Labonte and

Plude.

35.     The 2009 Proxy also stated the following:

**Shareholder Quorum and Voting**

> The DGCL and VBCA have the same basic quorum requirement for stockholder votes at meetings:  a majority of the votes entitled to be cast constitutes a quorum.  The Delaware quorum requirement may be reduced or increased by charter or bylaw provisions, but not to less then one-third of the shares entitled.  The Vermont quorum requirement may be increased by charter provisions.

> The DGCL establishes the following basic stockholder voting rule:  a majority vote of stockholders present in person or by proxy is the act of the stockholders.  The VBCA provides that an action on a matter is approved by the shareholders if the votes cast in favor of the action exceed the votes cast against the action.  *In effect, abstentions count as negative votes in Delaware, but not in Vermont.*  The Delaware voting requirement may be increased or decreased by the charter or bylaws; the Vermont voting requirement may be increased by the charter.

*Id.* at p. 9 (emphasis added).

36.     Following the reincorporation, in 2009, on March 16, 2010, ROAC announced

financial results for the fourth quarter and 2009, "highlighted by a return to profitability for the

quarter and year versus losses for the prior year periods, an increase in cash generated from

operations to approximately $10,800,000 for 2009, compared to about $2,300,000 for 2008, and

the reduction of total debt by an additional $7,500,000 in 2009..."  Commenting on the news,

Defendant Labonte stated:

"Demand for our stone remains extremely high in our key export markets; we simply did not have enough of the desired inventory to satisfy it.  We are taking steps to rectify this situation.  During the fourth quarter, we launched a development program in new areas in our Barre, Bethel and White Gardenia quarries in order to increase production and decrease unit costs beginning in 2010."

"Also encouraging was the improved performance of our manufacturing segment in the fourth quarter of 2009.  Revenue was flat with the prior year level, following negative revenue comparisons in each of the first three quarters, and operating income increased 15% reflecting improved fourth quarter sales from our authorized dealers and mausoleums."

"We are optimistic that we can grow both our quarry and manufacturing segments in 2010, even as we maintain tight control over operating costs and continuing deleveraging our balance sheet."

37.     On May 7, 2010, ROAC announced that its Board had received an unsolicited proposal from Swenson Granite Company, LLC., led by Chairman Kurt M. Swenson, his brother, Kevin Swenson, and Swenson President and CEO, Robert Pope, to purchase all outstanding shares of common stock "including shares underlying vested options, of ROAC, for a purchase price of $4.38 per share in cash."  This announcement was made not long after the representation in the 2009 Proxy, that "[t]he Company is not aware of any specific effort by any party to assume control of the Company," was disseminated to ROAC shareholders.

38.     Along with the announcement of the proposal, it was disclosed that Swenson "envision[s] making relatively minimal changes to the operations and employees of [ROAC] following the closing of the proposed transaction," and further that Swenson intends "to offer Donald Labonte the opportunity to buy shares of Swenson Granite as has been the case with other key officers of Swenson Granite," and "[i]n order to facilitate the financing of the proposed transaction by Swenson Granite", holders of the Class B Common Stock of ROAC who are existing shareholders of Swenson Granite or lineal descendents of existing shareholders who under Swenson Granite's bylaws are entitled to receive Swenson Granite shares free of any right

of first refusal by Swenson Granite, will be offered the opportunity to exchange their Class B

shares of ROAC for Swenson Granite shares or to receive the $4.38 cash price."

      39.     In its press release announcing the proposal, ROAC noted that the proposal

states that Swenson seeks to structure the transaction so that the value of ROAC assets can be

"stepped up" to fair market value to the extent possible under the Internal Revenue Code, but

that "there can be no assurance as to whether such a step-up can be achieved. Accordingly,

[ROAC's Board] cautions investors that an inability to achieve such a step-up could result in a

reduction of Swenson's proposed $4.38 per share price."

      40.     The Company also announced that its Board had formed a Special Committee

of "independent" directors to consider the proposal.

      41.     The letter proposal stated in part:

> We believe that the proposed transaction represents an attractive alternative for ROA and its shareholders. Our per share price reflects a substantial premium over the current trading price of the company's stock and provides a means for shareholders to gain liquidity for large blocks of stock in a short time horizon, something that the public trading market is unlikely to provide[.] We believe that federal capital gain tax rates are likely to rise in the short- or medium-term future and that an early transaction might allow shareholders to take advantage of the current rates. *We also believe that ROA is currently not well positioned to create value for its shareholders as a pubic company, given the company's current business plan, current analyst and trading practices, and the increasing cost of compliance with disclosure, accounting and other public company obligations.*

> We think that the company would be well-served by the board conducting a process of exploring its strategic options for maximizing shareholder value, including a consideration of our offer. We are prepared to work in good faith with the board, or any committee which it may choose to form, to firm up our financing and further develop our offer in the context of a process which is consistent with the directors' fiduciary duties. *As you know, we have considerable familiarity with the operations, assets, liabilities and employees of ROA, which we believe will enable us to expedite the due diligence process. We envision making relatively minimal changes to the operations and employees of ROA following the closing of the proposed transaction.* We intend to offer Donald Labonte the opportunity to buy shares of Swenson Granite as has been the case with other key officers of Swenson Granite. Before reaching agreement on definitive terms, among other things, we would ask to speak with Peter Gottlieb and Eric Kuby of Northstar Investments and

the Kuby Gottlieb fund, to ascertain their intentions toward a proposed transaction, given their large ownership position.

While Dick Kimball and Chuck Waite are small shareholders of Swenson Granite with each owning less than 1% of the outstanding shares and neither has served as a director of Swenson Granite for over a decade, we understand that they may be considered part of the prospective acquiring group.

[Emphasis added.]

42.     Following the announcement, ROAC's stock price increased from a close of

$3.38 per share on May 7, 2010, to $4.12 per share on the next trading day, May 10, 2010.

However, the announcement of the proposal had the effect of "capping" ROAC's stock price at

less than the $4.38 per share initial offer price (the "Initial Offer Price"). Indeed, the stock price

of ROAC did not trade above the Initial Offer Price prior to the announcement of the Proposed

Transaction, more than 5 months later.

43.     Also on May 10, 2010, ROAC filed a Form 8-K with the SEC, which included

the announcement and the letter.

44.     On Tuesday, May 11, 2010, the Company announced earnings, for the first

quarter 2010, including the announcement that the net loss for the first quarter of 2010 narrowed

to $2,092,000, or $.28 per share, compared to a net loss of $2,774,000, or $.37 per share, for the

first quarter of 2009. Further, revenue increased 26% to $7,511,000 from $5,938,000 for the first

quarter of last year.

45.     Defendant Labonte stated:

"We have always reported a loss in the first quarter due to the seasonal nature of our business. This year's sharply reduced first quarter loss was primarily the result of the substantially improved performance of our manufacturing operations, as well as continued reductions in overhead costs."

46.     The May 11, 2010 earnings release also announced that manufacturing revenue

for the first quarter of 2010 was up 38% to $3,889,000 compared to $2,814,000 for the first

quarter of 2009, as sales of monuments and industrial products both increased. The operating

loss in the manufacturing segment decreased to $484,000 from $864,000 a year ago, reflecting

the higher revenue and cost saving steps initiated last year. "Based on current trends, we are

optimistic regarding the performance of our manufacturing operations for 2010 as a whole,"

Labonte said.

47.     Further, quarry revenue for the three months ended April 3, 2010 increased 16%

to $3,622,000 compared to $3,124,000 for the first quarter of 2009, primarily the result of higher

shipments from the Company's export quarries.  Labonte stated that "[d]emand for our export

granite in particular remains strong, and we expect it to remain strong throughout the year. ...

The development program in our quarries we launched last year is on schedule, and we expect to

produce and deliver increased quantities of saleable granite throughout the rest of the year. ...

The development program in our quarries we launched last year is on schedule, and we expect to

produce and deliver increased quantities of saleable granite throughout the rest of the year." He

stated the Rock of Ages' "unallocated corporate overhead for 2010 will be approximately 10%

below 2009," and stated the Company was concentrating on "reducing our debt and [is] in

discussions with various lenders regarding options that may be available to us to reduce our

interest costs."

48.     According to *The Barre-Montpelier Times Argus*, ROAC also recently obtained

a contract with the Army Corps of Engineers to ship 54,000 tons of waste granite for a dike

system in Florida.

49.     On May 19, 2010, Plaintiff Semon filed a class action complaint in Vermont

Superior Court Washington County asserting breach of fiduciary duty claims based on

defendants' wrongful conduct related to the announcement of the Swenson proposal to purchase all of the outstanding shares of the Company for $4.38 per share in cash.

50.     The complaint alleged that the proposed transaction was the product of unfair dealing, and the price of $4.38 was unconscionable and unfair and so grossly inadequate as to constitute a gross breach of trust committed by the management defendants participating in the proposed transaction against the Company's public stockholders.

51.     On May 20, 2010, Rock of Ages issued a press release announcing "that the Special Committee of its Board of Directors has determined to commence a process to explore and consider possible strategic alternatives for Rock of Ages while it continues to consider the previously disclosed acquisition proposal."

52.     On August 10, 2010, Rock of Ages issued a press release titled "Rock of Ages Reports 9% Increase in Second Quarter Net Income to $0.21 Per Share." The press release stated the following:

> Rock of Ages Corporation (NASDAQ:ROAC) announced today that net income for the second quarter of 2010 increased 9% to $1,561,000, or $.21 per share, which included costs associated with the exploration of strategic options and shareholder lawsuit expenses of $493,000, or $0.07 per share. For the second quarter of 2009, net income was $1,433,000, or $.19 per share. Revenue for this year's second quarter increased 2% to $14,663,000 compared to $14,424,000 for the second quarter of 2009.

> Divisional operating income increased 26% to $3,200,000 compared to $2,536,000 last year, and unallocated corporate overhead decreased to $669,000 from $692,000.

> Manufacturing revenue for the second quarter of 2010 increased 7% to $8,025,000 compared to $7,512,000 for the second quarter of 2009, as sales of monuments and industrial products both increased. Operating income in the manufacturing segment increased to $1,562,000 from $1,373,000 a year ago, reflecting the higher revenue and cost reduction steps initiated last year. *"We remain confident regarding the performance of our manufacturing operations for 2010 as a whole," said Chief Executive Officer Donald Labonte.*

> Quarry revenue for the second quarter of 2010 decreased 4% to $6,638,000 compared to $6,912,000 for the second quarter of 2009, but operating income increased 41% to

$1,638,000 compared to $1,163,000 last year, reflecting lower operating expenses and higher productivity due to the development and production improvements undertaken in the past year. *"Our quarry development programs have increased our ability to produce and deliver higher quantities of saleable granite. Demand for our granites remains strong, so we are optimistic about quarry performance going forward,"* Labonte said.

For the six months ended July 3, 2010, revenue increased 9% to $22,174,000 from $20,362,000 for the first six months of 2009. Gross profit increased 21%, SG&A was down slightly, and divisional income increased 97% compared to the first half of 2009.

The net loss for the first half of 2010 was $531,000, or $0.07 per share, which included costs associated with the exploration of strategic options and shareholder lawsuit expenses of $493,000, or $0.07 per share. For the first six months of 2009, the net loss was $1,341,000, or $0.18 per share.

53.     Rock of Ages formally reported its second quarter financial results on Form 10-Q with the SEC on August 17, 2010. Again, notwithstanding the positive May 11, 2010 and August 10, 2010 earnings releases, ROAC's shares never traded above the Initial Offer Price because ROAC's stock price was capped by the May 7, 2010 announcement of the proposal by the Swenson Granite Group until the Proposed Transaction at a higher price was announced.

**The Proposed Transaction**

54.     On October 18, 2010, ROAC announced that it had entered into a definitive merger agreement (the "Merger Agreement") pursuant to which shareholders of Rock of Ages will receive $5.25 per share in cash, and Swenson Granite will acquire 100% ownership of Rock of Ages.

55.     According to the October 18 press release, "[t]he special committee's independent financial advisor has delivered an opinion to the effect that the $5.25 per share to be received by Rock of Ages shareholders in the merger is fair, from a financial point of view, to such shareholders. The $5.25 per share price represents a 57% premium to the average closing price of Rock of Ages Class A common stock for the 30 days prior to the May 7, 2010 announcement of Swenson Granite's initial proposal to acquire 100% ownership of Rock of

Ages, and a 84% premium to the average closing price for the 12 months prior to the May 7,

2010 announcement." However, had the May 7 announcement not capped the market price of

ROAC's shares, in light of the positive earnings releases on May 11 and August 10, it is almost

assured that ROAC's shares would have traded higher than the Initial Offer price and that the

premiums touted in the October 18, 2010 release would not look nearly as robust.

56.     Further, according to the release, "[c]onsummation of the merger is conditioned

upon, in addition to approval of the merger agreement by the majority vote of Rock of Ages'

Class A and Class B common stock, voting together, approval by a majority of the outstanding

shares of Class A common stock, excluding shares held by members of Swenson Granite. Rock

of Ages will schedule a special meeting of its shareholders for the purpose of obtaining

shareholder approval of the merger agreement."

57.     Additionally it stated that "Kurt Swenson, the Chairman of Swenson Granite

and non-executive Chairman of Rock of Ages, together with his brother, Kevin Swenson, Vice

President of Swenson Granite, and Robert Pope, President and Chief Executive Officer of

Swenson Granite, own approximately 71% of Swenson Granite. They, along with certain other

members of Swenson Granite who are also Rock of Ages shareholders, have agreed with

Swenson Granite to vote their shares, representing approximately 81% of the total voting power

of all Rock of Ages shares, in favor of approval of the merger agreement." Thus the condition

that a majority of ROAC's Class A and Class B common stock, voting together, have to approve

the Proposed Transaction, is a foregone conclusion.

58.     Further according to the October 18, 2010 release, "[p]rior to the merger, Kurt

Swenson, Kevin Swenson, Robert Pope and certain other members of Swenson Granite who are

also shareholders of Rock of Ages, will contribute to Swenson Granite a total of 258,326 Class A

shares and 2,449,793 Class B shares of Rock of Ages in exchange for additional shares of membership interest in Swenson Granite, and will not receive the $5.25 per share cash merger price for those Rock of Ages shares.

59.     Thus, Defendants Swenson, and Kimball and former director Charles Waite, will receive benefits from the Proposed Transaction not available to ROAC's public shareholders in that they will retain an equity interest in the successor to ROAC, assuming the Proposed Transaction is consummated, while the other ROAC public shareholders will be deprived of any equity interest in ROAC or its successor in the future.

60.     ROAC stock closed at $4.10 per share on October 15, 2010, and on the next trading day increased to close at $5.14 per share. The stock increased again to close at $5.20 per share on October 21, 2010, and, subsequently, closed as high as $5.24 per share.

61.     Also on October 18, 2010, the Company filed a Form 8-K with the SEC attaching the Merger Agreement.

62.     On October 19, 2010, North Star Investment Management Corp., which controls 739,551 voting shares of ROAC Class A common stock, filed a Schedule13D with the SEC announcing its intention to vote in favor of the Proposed Transaction. As a result, the Proposed Transaction almost certainly will be approved by a majority of ROAC's Class A shareholders, excluding shares held by members of Swenson Granite.

63.     On October 20, 2010, ROAC filed a Schedule 13D/A with the SEC regarding a Voting and Contribution Agreement whereby Individual Defendants Swenson and Kimball, along with Waite have agreed to vote their shares in favor of the Proposed Transaction, and will receive shares of Swenson Granite stock rather than cash like the public stockholders.

64.     As discussed, Defendants Swenson, Labonte, and Kimball, a majority of the Board, and Waite, will all receive additional shares or options of Swenson Granite as opposed to the $5.25 price, and will thus benefit from the Proposed Transaction beyond what is available to the public shareholders of ROAC. These benefits incentivized these defendants to approve the Proposed Transaction to the detriment of ROAC public shareholders.

65.     Although the Special Committee claimed to have "considered possible strategic alternatives," this "shop" process was effectively window dressing, as the whole Board was beholden to Swenson Granite, and the Special Committee knew that no other bidder was likely to emerge due to the control of ROAC by the Swenson Granite Group.

66.     The independence of Individual Defendants Labonte and Plude has been further compromised as a result of the agreement to retain the current senior management after completion of the Proposed Transaction.

67.     In addition to the financial conflicts of the individual members of the Board, the financial advisor to the Special Committee, investment banking firm, Covington Associates LLC ("Covington"), was conflicted. As noted in the Preliminary Proxy filed on October 29, 2010 (the "Preliminary Proxy"), Covington had a pre-existing relationship with ROAC, as it was hired by the Company, led by Kurt Swenson and members of management affiliated with the Swenson Granite Group, to advise ROAC "during the Company's earlier consideration of strategic and business alternatives that resulted in the sale of the retail division," back in 2007. The multiple hirings of Covington by persons in control of Swenson Granite, as well as ROAC, incentivized Covington to please such individuals to increase its odds of being hired again in the future. Furthermore, as detailed below, Covington was promised a "success fee" that would only be paid in the event the Proposed Transaction was "completed," providing a serious conflict of interest.

68.     In addition to the conflict of the Special Committee's "independent" financial advisor, ROAC also tainted the process of reviewing, and ultimately approving, the Proposed Transaction by enlisting the Company's regular outside counsel, McLane, Graf, Raulerson & Middleton PA ("McLane") to represent the Company with respect to the Proposed Transaction. According to the Preliminary Proxy Statement:

> With respect to McLane's continued representation of the Company, it was determined that McLane's estate planning services for Mr. Swenson and his brother and its brief and immaterial services for Parent on an intellectual property matter were not disabling conflicts or otherwise relevant to McLane's ability to effectively represent the Company with respect to the Swenson Proposal and related matters. The special committee considered McLane's in-depth knowledge of the Company's operations, coupled with its excellent working relationship with the Company's senior management, as positive factors that would benefit the Company and its stockholders in responding to the Swenson Proposal and in any process that might be initiated to explore strategic alternatives.

Thus, the Preliminary Proxy admits that McLane had done legal work for Kurt and Kevin Swenson personally, as well as Swenson Granite, yet continued to legally represent ROAC, which also happens to be controlled by members of the Swenson Granite Group, in connection with evaluating whether ROAC should be sold to the Swenson Granite Group.

69.     Further, the terms of the Merger Agreement itself are drafted in favor of Swenson Granite Group, and make it highly unlikely that any alternative proposal will come forward.

70.     In Section 6.3(a) of the Merger Agreement, there is a provision regarding competing proposals that unfairly restricts the Board from soliciting alternative proposals and requires ROAC to advise Swenson Granite about any competing offers.  The provision states the following:

> Section 6.3 Acquisition Proposals.

(a) The Company will as promptly as reasonably practicable (and in any event within two Business Days after receipt by the Company Board or the Special Committee) notify Parent of the receipt of any Acquisition Proposal. The Company shall notify Parent, in writing, of any decision of the Company Board or of the Special Committee or a majority of the (but not less than two) Qualified Directors (with respect to both this Agreement and such Acquisition Proposal) as to whether to consider any Acquisition Proposal or to enter into discussions or negotiations concerning any Acquisition Proposal or to provide material non-public information or data with respect to the Company to any Person, which notice shall be given as promptly as reasonably practicable after such determination was reached (and in any event no later than two Business Days after such determination was reached). The Company will (i) provide Parent with written notice setting forth such information as is reasonably necessary to keep Parent reasonably informed in all material respects of the status and material terms of any such Acquisition Proposal and of any material amendments thereto and (ii) promptly (and in any event within two Business Days of such determination) notify Parent of any determination by the Company Board or of the Special Committee or a majority of the (but not less than two) Qualified Directors (with respect to both this Agreement and such Acquisition Proposal) that such Acquisition Proposal constitutes a Superior Proposal. The Company will provide to Parent copies of all non-public information which the Company shall provide to an entity or person or group thereof making an Acquisition Proposal.

71.     Further, Section 6.3(b) restricts the Board from accepting another acquisition

proposal:

(b) Subject to Section 6.3(c) and Section 6.3(d), neither the Company Board nor any committee thereof shall, directly or indirectly, (i)(A) withdraw or modify in a manner adverse to Parent or Merger Sub the Company Board Recommendation; (B) adopt or recommend any Acquisition Proposal; or (C) in the event of a tender offer or exchange offer for any outstanding Company Common Stock, fail to recommend against acceptance of such tender offer or exchange offer by the Company's shareholders within 10 Business Days of the commencement thereof (for the avoidance of doubt, the taking of no position or a neutral position by the Company Board or any committee thereof in respect of the acceptance of any tender offer or exchange offer by its shareholders shall constitute a failure to recommend against any such offer) (any action described in clauses (A)-(C) above being referred to as a " Change of Recommendation ") or (ii) allow the Company to execute or enter into any merger agreement, acquisition agreement or other similar agreement with respect to any Acquisition Proposal (an "Acquisition Agreement").

72.     Section 6.3(c) contains a limited "fiduciary out" provision which states:

(c) Notwithstanding the foregoing or anything else in this Agreement to the contrary, prior to the Shareholder Approvals, the Company may, if the Special Committee or a majority of the (but not less than two) Qualified Directors (with respect to both this Agreement and such Acquisition Proposal), and the Company Board if

required by applicable provisions of the Vermont Laws or the Company Bylaws, determines in good faith, after consultation with its outside counsel, that the failure to take such action would reasonably be expected to be inconsistent with the fiduciary duties of the Company's directors under applicable Law, (i) make a Change of Recommendation and/or (ii) in response to a Superior Proposal, cause the Company to terminate this Agreement to enter into an Acquisition Agreement that contemplates a Superior Proposal; provided , however , that the Company may not make a Change of Recommendation or terminate this Agreement pursuant to this Section 6.3(c) unless the Company shall have provided at least five Business Days' notice to Parent that the Company intends to take such action and specifying the reasons therefore, including, if the basis of the proposed action by the Company is a Superior Proposal, the material terms and conditions of such Superior Proposal (it being understood and agreed that any amendment to any material term of such Superior Proposal shall require a new notice and a new five Business Day period). In determining whether to make a Change of Recommendation or to cause the Company to so terminate this Agreement pursuant to the terms of this Section 6.3(c), the Special Committee or a majority of the (but not less than two) Qualified Directors (with respect to both this Agreement and such Acquisition Proposal), and the Company Board if required by applicable provisions of the Vermont Laws or the Company Bylaws, shall take into account any changes to the terms and conditions of this Agreement proposed by Parent to the Company in response to any such notice.

73.     The Merger Agreement also contains provisions regarding termination

expenses, which require ROAC to pay Swenson Granite's out-of-pocket costs and expenses

incurred in connection with the Merger Agreement, including, without limitation, the fees and

disbursements of Swenson Granite's counsel, financial advisors, accountants and bankers, if the

defendants cause the Company to terminate the Merger Agreement pursuant to the lawful

exercise of fiduciary duties.  This section, 8.2(d), is unreasonable because the costs and expenses

may be substantial and are not limited in any way under the provision.

74.     Thus, any "superior proposal" will necessarily have to be significantly greater

than the costs and expenses of Swenson Granite, however great they may be, in order to receive

consideration.  Along with the other measures mentioned herein, this, along with the

overwhelming stock ownership by members of the Swenson Granite Group, effectively

precludes other bids and negatively impacts ROAC shareholders' ability to get the best price for their shares.

75.     It is also unclear from the Preliminary Proxy whether the Special Committee had the power to adopt a shareholder rights plan, or "poison pill," whereby it could have fended off a possible tender offer by the Swenson Granite Group had the Special Committee failed to agree to a price. Absent such authority, the Special Committee's negotiating leverage would have been substantially impeded. The omission of this material information is further detailed below.

**The Proposed Transaction Price is Grossly Inadequate**

76.     The price of $5.25 per share to be paid to Class members, pursuant to the Proposed Transaction (the "Offer Price"), while better than the Initial Offer Price, remains unfair to the public stockholders because, among other things, the intrinsic value of ROAC materially exceeds this amount given expected operating results, net asset value, cash flow profitability, and established markets.

77.     Defendants have undervalued the Company's common stock by ignoring the full value of its assets and future prospects, and thus the Proposed Transaction does not reflect the true financial position of ROAC.

78.     The Proposed Transaction will deny the Class the right to share in the value of the Company's business as well as its future growth and profits going forward, and the Offer Price is inadequate for the following reasons:

> a)  As discussed at pp. 15 – 18 *infra*, ROAC's sales outlook is much brighter than indicated by its performance in recent years. ROAC's financial results for Fourth

Quarter 2009, 2009, First Quarter 2010 and Second Quarter 2010 show that the Company's financial position is improving.

b) For example, ROAC reported its Third Quarter 2010 results on October 29, 2010 and, according to the release, "net income for the third quarter of 2010 was $2,200,000, or $0.30 per share," up dramatically from third quarter of 2009, when net income was $1,534,000, or $0.21 per share. Additionally, "[r]evenue for this year's third quarter increased 22% to $15,756,000 compared to $12,881,000 for the third quarter of 2009," and "[d]ivisional operating income increased 44% to $3,583,000 compared to $2,492,000 last year, and unallocated corporate overhead decreased to $622,000 from $660,000. … Manufacturing revenue for the third quarter of 2010 increased 11% to $7,719,000 compared to $6,967,000 for the third quarter of 2009."

c) Also, the October 29, 2010 release stated that "[d]ecreased sales in the Barre monumental division were offset by increased sales in the Rock of Ages Canada monumental division and industrial products. Operating income in the manufacturing segment increased to $1,264,000 from $1,084,000 a year ago, reflecting the higher revenue." Defendant Labonte stated, "[t]he mausoleum sales have not bounced back as quickly as we had hoped but the industrial products and our Canadian monumental sales have more than filled the gap. *We remain confident regarding the performance of our manufacturing operations for 2010 as a whole.*"

d) Moreover, "Quarry revenue for the third quarter of 2010 increased 36% to $8,037,000 compared to $5,914,000 for the third quarter of 2009, and operating

income increased 65% to $2,319,000 compared to $1,408,000 last year, reflecting the higher revenue, lower operating expenses and higher productivity due to the development and production improvements undertaken in the past years. Further, as Defendant Labonte said in the October 29, 2010 release, "*as we expected, our quarry development programs have increased our ability to produce and deliver higher quantities of saleable granite. The demand for our granite remains strong and we continue to be optimistic about our quarry performance for the remainder of the year.*" *Id.*

e) Despite the economic downturn, which led to decreased demand for private estate mausoleums, ROAC expanded its North American distribution network. This increased distribution will be beneficial for sales in the manufacturing division as the economy continues to rebound. According to a letter to shareholders in the 2008 Annual Report, ROAC "increased [its] North American distribution network by adding a number of successful monument retailer to our ever-increasing list of retail partners." Also according to the May 11, 2010 earnings release, "[m]anufacturing revenue for the first quarter of 2010 was up 38%" from the same quarter 2009.

f) ROAC's recent facilities upgrades and other investments will reduce costs and lead to higher profit margins. A 2007 letter to shareholders stated, "Donald [Labonte] is leading a very aggressive change in our quarry operations to substantially reduce costs by converting all of our quarries to drive-in quarries using quarry wire saws and reducing manpower." Further, the May 11, 2010 press release announced that the operating loss in the quarry increased compared

to the same quarter 2009 because, "the Company employed significantly more manpower in its Barre, Bethel, Gardenia, and Salisbury quarries during the quarter compared to the prior year to prepare more areas for quarrying and build inventory levels."

g) ROAC's efforts to reduce overhead continue to improve ROAC's profit outlook, and the elimination of costs related to the Company's public status will further accelerate profitability. In the announcement of Kurt Swenson's retirement as CEO, the Company also revealed that "[o]ne of the last major steps in the planned return of the Company to its quarrying and manufacturing roots, this senior management transition will simplify our management structure and reduce unallocated overhead expenses by nearly $500,000 annually beginning in Q4 2008." According to the May 11, 2010 press release, unallocated corporate overhead decreased 34% from the first quarter 2009, as a result of lower salary, pension, audit and franchise tax expenses. The release stated that "We are confident that our unallocated corporate overhead for 2010 will be approximately 10% below 2009."

h) The process that led to the Proposed Transaction shows that it was biased in favor of Swenson Granite. Among other things, on July 1, 2010, Plaintiff Semon's counsel sent to the Special Committee, a detailed analysis of the Initial Offer Price (with exhibits prepared by Plaintiff's financial consultant that contained over 100 pages) with various assumptions, necessarily based on publicly available information, presenting per share price ranges of $7.11 - $7.53 and $5.95 - $6.41. The Special Committee's legal advisor represented in writing that the Special

Committee, with the assistance of its advisors, had "carefully reviewed"

Plaintiff's analysis. Neither the Special Committee nor its advisors ever informed

Plaintiff Semon or is counsel that they had any issues or concerns relating to said

analysis. The Special Committee also refused to provide non-public information

requested by Plaintiff Semon that would have enhanced Plaintiff's analysis,

notwithstanding that Plaintiff, through his counsel, agreed to enter into a

confidentiality agreement. The Special Committee turned a blind eye to being

fully informed, in breach of its members' fiduciary duties of care, and by failing

to meet (by phone or in person) with Plaintiff Semon, his counsel or his financial

consultant to discuss the analysis Plaintiff sent to the Special Committee and any

issue the Special Committee had with the aforementioned valuations and analysis.

## The Defendants' Disclosures in the Preliminary Proxy Statement are Materially Inadequate

79.     On October 29, 2010, ROAC filed the Preliminary Proxy on Form 14A with the

SEC.

80.     In the address to ROAC shareholders recommending the Merger Agreement,

signed by Individual Defendant Fox, the Preliminary Proxy states, in part, the following:

> The special committee and our board of directors have unanimously determined that the merger is fair to and in the best interests of our shareholders who will be entitled to receive the $5.25 per share cash merger price, and recommend that you vote "FOR" approval of the merger agreement.

> Kurt Swenson, the Chairman of Parent and non-executive Chairman of Rock of Ages, together with his brother, Kevin Swenson, Vice President of Parent, and Robert Pope, President and Chief Executive Officer of Parent, own approximately 71% of Parent. They, along with certain other members of Parent who are also Rock of Ages shareholders, have agreed with Parent to vote their shares, representing approximately 81% of the total voting power of all Rock of Ages shares, in favor of approval of the merger agreement.

*However, under the merger agreement, consummation of the merger is conditioned upon, in addition to approval of the merger agreement by the majority vote of the Rock of Ages' Class A and Class B common stock, voting together, approval by a majority of the outstanding shares of Class A common stock, excluding shares held by members of Parent. Thus, your vote is very important regardless of the number of shares you own. Your failure to vote will have the same effect as a vote against the merger agreement.* At the special meeting you will also be asked to consider and vote on a proposal to adjourn the special meeting if necessary to permit further solicitation of proxies in the event that at the time of the special meeting there are not sufficient votes of shares of Class A common stock, excluding such shares held by members of Parent, to satisfy this condition in the merger agreement. Our board of directors unanimously recommends that you vote **FOR** this proposal. [Emphasis in italics added.]

81.     Contrary to the representation presented in the 2009 Proxy regarding the reincorporation from Delaware to Vermont, the Preliminary Proxy states that a failure to vote (*i.e.* an "abstention") will have the same effect as a vote against the Merger Agreement. As noted above, in the 2009 Proxy, investors were told that "[i]n effect, abstentions count as negative votes in Delaware, but not in Vermont." Either the representations to ROAC shareholders regarding the effect of a non-vote under Vermont law is incorrect in the 2009 Proxy used to entice ROAC shareholders to vote in favor of the reincorporation, or it is incorrect in the Preliminary Proxy. At a minimum, the Preliminary Proxy omits to disclose that its statements regarding the effect of abstentions on voting regarding the Proposed Transaction is inconsistent with its disclosures on the same subject in the 2009 Proxy, and omits to disclose that the statements on the issue are false in one of the Proxy Statements, either the Preliminary Proxy or the 2009 Proxy. In any event, if the passage in the Preliminary Proxy is false, it needs to be corrected. If the passage in the 2009 Proxy was false, then the entire reincorporation of ROAC from Delaware to Vermont may have been secured under false pretenses.

82.     The Preliminary Proxy discloses that Covington Associates, LLC, the Special Committee's "independent" financial advisor delivered a written opinion regarding the fairness of the Proposed Transaction consideration. The Preliminary Proxy states:

Covington has delivered a written opinion to the special committee and the board of directors to the effect that, as of October 15, 2010, and based on and subject to the assumptions, limitations and qualifications set forth in the opinion, the $5.25 per share merger consideration to be received by the Company's shareholders in the merger is fair, from a financial point of view, to such shareholders. Covington's opinion was provided to the special committee and the board of directors in connection with the special committee's and the board of directors' evaluation of the merger consideration to be paid in the merger, did not address any other aspect of the merger and did not constitute a recommendation to any holder of the Company's common stock as to how such holder should vote or act with respect to any matters relating to the merger.

*     *     *

In the special committee's engagement letter with Covington, the Company agreed to pay Covington $250,000 upon rendering its written opinion, whether or not the opinion was favorable. *The Company has also agreed to pay Covington a success fee upon completion of the merger*, and to reimburse Covington for its out-of-pocket expenses incurred in connection with its engagement as the special committee's financial advisor.

*Id.* at p. 5 (emphasis added).

83.     Clearly, the "success fee" creates a conflict of interest for Covington, as noted above because it would only be payable if the Proposed Transaction is "completed." The fact that the amount of this "success fee" is not disclosed is a material omission because ROAC shareholders cannot determine the severity of this conflict of interest. Moreover, even though the Special Committee's engagement letter provides that Covington would be paid $250,000 upon rendering a written opinion, whether favorable to the Proposed Transaction or not, the disclosure of this agreement misleadingly omits that Covington would likely not render a "written opinion" if such opinion was unfavorable. It is common practice that an unfavorable opinion by a financial advisor to a special committee would be reported orally and not reduced to writing, thereby allowing the bidder to increase its offer to come within a range of fairness. Thus, in reality, Covington would only earn the $250,000 payment if it issued a favorable opinion, which would then be in writing. These omissions effectively misrepresent the severity of Covington's conflict of interest in performing its work for the Special Committee.

84.     Further, the Preliminary Proxy states:

> With respect to Covington, the special committee concluded that its previous engagement by the Company meant that Covington already had a detailed knowledge of the Company's business and financial strategy, and thus it would be well positioned to work efficiently. This fact, along with the excellent service and advice provided by Covington to the Company during the Company's earlier consideration of strategic and business alternatives that resulted in the sale of the retail division, were also important factors in the special committee's unanimous decision to select Covington as its independent financial advisor. After reviewing Covington's prior representation of the Company, the special committee concluded that Covington would be able to provide objective and independent advice to the special committee in connection with this engagement.

However, the Preliminary Proxy does not clearly state the specific services Covington completed regarding the sale of ROAC's retail division, and does not give any information about the compensation Covington received for those services. Nor is there is any information about whether Covington had previously rendered services to any other parties to the Proposed Transaction. Without these disclosures, shareholders cannot accurately assess potential conflicts Covington may have had beyond what has been disclosed elsewhere about the contingent nature of its fee.

85.     The Preliminary Proxy also purports to describe events that led up to the execution of the Merger Agreement (*i.e.* the background of the Proposed Transaction). Significantly, the Special Committee claims that it undertook a process of exploring strategic alternatives for ROAC, but provides materially inadequate information about the process.

86.     For example, the Preliminary Proxy states:

> After reviewing and considering Covington's overview of the Company and its preliminary views regarding possible strategic alternatives to the Swenson Proposal, the special committee concluded that it would be in the best interests of the Company and shareholders who were not affiliated with the Swenson Group, to explore strategic alternatives to the Swenson Proposal. Accordingly, the special committee unanimously resolved that, with the assistance of Covington, it would commence a process to explore and consider possible strategic alternatives for the Company while continuing to consider the Swenson Proposal. … Based on its due diligence, Covington concluded that the best

strategic alternative available to the Company would be the sale of the Company to either a strategic or financial buyer if a transaction could be developed which was fair and in the best interests of the Company and its shareholders, including shareholders unaffiliated with Parent.

*Id.* at p. 35. These disclosures, however, fail to provide any information about what alternatives were considered to a sale of the Company, including, but not limited to, what shareholder values were reflected by the other alternatives, and how Covington determined that a sale was the best alternative. The Preliminary Proxy also does not provide any information about whether and how Covington's compensation would have changed if a strategic alternative other than a sale to the Swenson Granite Group was pursued.

87.     Further according to the Preliminary Proxy:

On July 8, 2010, another telephonic meeting of the special committee was convened. In addition to all of the members of the special committee, Skadden and Covington attended this meeting. At this meeting, Covington reviewed with the special committee the solicitation process it had undertaken in which it had contacted 64 potentially interested parties since June 2nd, and the responses of the contacted parties. Of these 64 parties, comprised of both financial and strategic parties, 35 parties had declined the opportunity, 11 parties had failed to respond after being contacted numerous times and 18 parties continued to express some level of interest. As next steps, Covington recommended, and the special committee approved, Covington's continuing to work the potentially interested parties list, soliciting potentially interested parties to schedule management meetings and calls within the ensuing two weeks, and sending a letter during the week of July 12th to remaining interested parties inviting them to submit non-binding indications of interest by July 29th.

*Id.* at p. 36. The information provided in the Preliminary Proxy regarding the review process fails to provide any information about the selection criteria used to identify the parties contacted, or any information about how, when, and by whom the list of "potentially interested parties" was compiled. Nor does the Preliminary Proxy describe the nature of the parties contacted, *i.e.* were they financial buyers (such as private equity investors), strategic buyers, or both (and if so, what was the proportion of financial to strategic buyers contacted?). This is material information

because investors need to know the time line and the steps taken by the Special Committee to

shop the Company so they can determine whether it conducted a fully-informed and fair process.

> 88.     Further regarding the process, the Preliminary Proxy states the following:

> By July 29, 2010, the deadline to submit nonbinding indications of interest, Covington had received only two IOIs. One IOI was submitted by Parent at the same $4.38 per share price as the Swenson Proposal submitted in May 2010 (the "Parent IOI"). The other IOI was submitted by a private equity firm that proposed to acquire only the Company's manufacturing business. ... Covington reviewed with the special committee the Parent IOI and the other IOI it had received. In Covington's view, the IOI from the private equity firm that proposed to acquire only the Company's manufacturing business was a non-viable proposal as compared to Parent's IOI or to the Company continuing as a public company. Covington noted that the offer price for the manufacturing division was not competitive with the value for that division implied by the $4.38 per share offer price in Parent's IOI, and disposing of manufacturing would result in the Company continuing to have the burdens and expense of being a public reporting company with the same, or worse, strategic and operational issues and risks, and the same, or worse, illiquidity of its stock, as it then faced.

*Id.* at p. 37.  This information fails to inform investors what price was offered for the

manufacturing business in the only other IOI than the one from the Swenson Granite Group that

Covington received, and what value was implied for that division by the $4.38 offer price of

Swenson Granite's IOI.  Without this information, investors are unable to determine whether the

analysis was fully-informed and fair.  The fact that not one other bid for the whole Company

emerged also suggests that the shopping process of the Special Committee was a sham in that the

Special Committee knew, well before its efforts started, that no other bidder would emerge in

light of the overwhelming control of ROAC by the Swenson Granite Group.

> 89.     The Preliminary Proxy also fails to provide sufficient information regarding

negotiations of the price of the Proposed Transaction.  The Preliminary Proxy states the

following:

> Covington also pointed out that, since under the merger agreement the majority of the minority approval would need to be obtained to consummate the merger, in their view a meaningful increase to their $4.38 per share offer — in all likelihood significantly into

the $5.00 per share range — could well be necessary to be reasonably confident that that vote requirement would be met. No agreement on price was reached at this meeting. However, Mr. Swenson indicated that, in light of Covington's discussion, and once he had the September 30 balance sheet of the Company and a more complete understanding of the total number of shares of Company common stock that members of Swenson Granite intended to contribute to Parent in exchange for additional shares of membership interest in Parent, and thus could re-evaluate Parent's overall cash requirements and borrowing capacity under the proposed loan facility with People's United and Key Bank, he believed Parent might be able to revise its offer to at least $5.00 per share. He noted that, of course, definitive loan agreements needed to be finalized and a definitive commitment letter executed by the lending banks. Mr. Swenson also indicated that, especially in light of the majority of the minority vote that would be required for the transaction to be consummated, it would be important for Parent, prior to entering into a definitive agreement, to have an indication as to whether a transaction at a particular price or within a range of prices would be viewed favorably by the Company's most significant institutional investor.

*Id.* at p. 40. This information omits details about what led Covington to believe that a $4.38 per share price would be inadequate to obtain the necessary votes, whereas an offer of $5.00 or above would be successful. It also fails to provide any detail of conversations with the significant institutional investor regarding the Offer Price.

90.     Additionally, as discussed above, it is unclear from the Preliminary Proxy whether the Special Committee had the power to adopt a "poison pill" whereby it could have fended off a possible threatened tender offer by the Swenson Granite Group if the Special Committee could not reach agreement on a deal with the Swenson Granite Group. Without such power, the negotiating leverage of the Special Committee would be significantly diminished. Such a disclosure is material, in that it lets shareholders know the true strength, or lack thereof, of the Special Committee's bargaining leverage vis-à-vis the Swenson Granite Group.

91.     The Preliminary Proxy also contains financial projections, and the fairness opinion of Covington in connection with its report to the Special Committee is annexed to the Preliminary Proxy. However, these financial disclosures omit material information that ROAC

public shareholders need in order to make an informed determination on how to vote their shares:

a)  The disclosed projections on p. 55 of the Preliminary Proxy appear to reflect debt service and exclude free cash flows. Free cash flows should be included in the projections. Further, while Covington's performed a "discounted cash flow analysis of the Company's estimated after-tax free cash flows for the fiscal years 2010 to 2014 based on both the Company's management projections and its historical operations," the Preliminary Proxy fails to state whether the free cash flows used in Covington's discounted cash flow ("DCF") analysis were levered or unlevered.

b)  Page 56 of the Preliminary Proxy discussed that "earlier projections forecast for the years 2010, 2011, 2012, 2013, 2014 and 2015" differed from the financial projections included in the Preliminary Proxy. However, the Preliminary Proxy fails to explain, or otherwise discuss, how the presented projections differed from the "earlier projections," including the reasons for such differences. The presented projections also do not disclose why projected EBIT decreases in most years, while projected net income stays approximately the same or increases.

c)  Covington's opinion stated:

Covington selected the following companies, because, among other reasons, they are publicly traded companies with operations that for purposes of analysis may be considered similar to certain aspects of the Company's operations: Arbor Memorial Services Inc., Boral LTD, Carriage Services Inc., Granitifiandre s.p.a., HeidelbergCement AG, InvoCare LTD, Lafarge SA, Martin Marietta Materials Inc., Matthews International Corporation, Rocamat, Service Corp. International, Stewart Enterprises Inc., Stonemor Partners LP, and Vulcan Materials Company.

However, the disclosure fails to state the objective screening or exclusion criteria, such as SIC code, if any, used to determine Covington's sample.

d)      Further, in the Comparable Public Companies Analysis by Covington set forth on p. 59, the Preliminary Proxy fails to state whether the pricing multiples indicated for ROAC reflect the Offer Price or ROAC's closing price on October 13, 2010.  It is also unclear whether Covington explicitly included the value of ROAC's NOL tax assets in its comparable public companies analysis, and if it did not, why not.

e)      In the Comparable Transactions Analysis by Covington, the Preliminary Proxy (at p. 61) states that "Covington also analyzed publicly available financial information for the following twelve selected merger and acquisition transactions completed no earlier than May 2007, involving building materials, quarrying, and death care companies (the transactions are categorized by the industry grouping of each target company)," but does not disclose other objective screening criteria, including size, it used, if any.  Further, this section fails to explain why Covington did not consider transactions prior to May 2007, omits the detailed transaction pricing multiples for the comparable transaction (consistent with the presentation of the comparable public companies analysis), and does not explain whether Covington explicitly included the value of ROAC's NOL tax assets in its comparable transaction analysis.

f)      In the DCF Analysis, while the Preliminary Proxy states (at p. 62) that "[t]he terminal value was computed by applying an EBITDA exit multiple

of 6.0x – 8.0x," there is no detail to justify Covington's selection of such a low range of terminal multiples in light of the generally higher market-based indication from the comparable public companies analysis and the comparable transaction analysis, as well as ROAC's own, higher EBITDA multiple. Likewise, the DCF Analysis summary fails to disclose the basis for a 13% to 15% discount rate range.

g)     Additionally in the DCF Analysis, while the Preliminary Proxy (at p. 62) discloses that the analysis "resulted in an illustrative range of equity values of the Company ranging from $18.823 million to $34.384 million based on a discounted cash flow analysis of the Company's projections," it does not disclose the corresponding per-share pricing indications.

92.     Further, Individual Defendants, including Kurt Swenson, and other members of the Swenson Group, are in possession of non-public information concerning the financial condition and prospects of ROAC, and especially the true value and expected increased future value of ROAC and its assets, which they have not disclosed to ROAC's public stockholders. The Individual Defendants, who constitute ROAC's Board, are familiar with the Company's future prospects but have not disclosed the Company's true future potential.

93.     By virtue of the foregoing, the Individual Defendants have participated in unfair business practices and self-dealing toward Plaintiffs and other members of the Class and have engaged in and substantially assisted and aided each other in breach of the fiduciary duties owed by them to the Class.

## COUNT I

### Claim for Breaches of Fiduciary Duties
### Against the Individual Defendants

94.     Plaintiffs incorporate each and every allegation set forth above as if fully set forth herein.

95.     By the acts, transactions and courses of conduct alleged herein, the Individual Defendants, as officers and/or directors of the Company, and Kurt Swenson and his affiliates, as controlling shareholder, have violated their fiduciary duties of good faith, loyalty, and due care at the expense of Plaintiffs and other members of the Class.

96.     The consideration to be paid to Class members as offered in the Proposed Transaction and the process employed by the Individual Defendants in connection therewith, are unfair and contrary to the interests of the public stockholders because, among other things:

        a)      The Company's intrinsic value, giving due consideration to its growth and profitability, and the underlying strength of its business is significantly greater than the offering price;

        b)      The Offer Price undervalues the Company's common stock by ignoring the full value of its future prospects, and is attempting to take the Company private at a time when it is about to reap the benefits of its substantial efforts, funded by the public shareholders, detailed above. The Proposed Transaction does not reflect the true financial position of the Company given that ROAC is poised for significant growth.

97.     The Proposed Transaction is wrongful, unfair and harmful to ROAC's public stockholders, and represents an effort by certain of the defendants to aggrandize the financial position and interests of Defendant Swenson Granite and those Individual Defendants who will

maintain an interest in Swenson Granite, or otherwise retain their jobs, following the Proposed Transaction, at the expense and to the detriment of Class members. The Proposed Transaction is an attempt to deny Plaintiffs and the other members of the Class their right to share proportionately in the true value of ROAC, while usurping the same for the benefit of Kurt Swenson and those interested Individual Defendants who will maintain an interest in Swenson Granite on unfair and inadequate terms.

98.     The Individual Defendants, in failing to disclose the material non-public information in their possession as to the value of ROAC, the full extent of the future earnings potential of ROAC and its expected increase in profitability, the various conflicts of interest and other issues discussed above, have breached and are breaching their fiduciary duties to the members of the Class.

99.     The Individual Defendants' conduct constitutes violations of their fiduciary duties owing to the Class. The Proposed Transaction is also coercive to the extent that the public shareholders of ROAC have no hope that another bidder might arise with a superior proposal because of the Swenson Granite Group's voting control over the Company and the onerous deal protection devices defendants have consented to in the Merger Agreement discussed above. This control makes it impossible for another bidder to acquire the Company without the Swenson Granite Group's express approval as was evidenced by the failed "attempt" to shop the Company engaged in by the Special Committee and Covington as described above.

100.     As a result of defendants' unlawful actions, Plaintiffs and the other members of the Class will be harmed in that they will not receive their fair portion of the value of ROAC and will be prevented from obtaining the real value of their equity ownership of the Company.

101.    Absent injunctive relief, Plaintiffs and the Class will continue to suffer irreparable harm as a result of the Individual Defendants' breaches of fiduciary duty, for which Plaintiffs and the Class have no adequate remedy at law.

## COUNT II

### Claim for Aiding and Abetting the Individual Defendants' Breaches of Fiduciary Duty Against ROAC, Swenson Granite Company, LLC and Granite Acquisition, LLC

102.    Plaintiffs repeat and reallege the preceding allegations as if fully set forth herein.

103.    Defendants ROAC, Swenson Granite Company, LLC, and Granite Acquisition, LLC, knowingly assisted the Individual Defendants' breaches of fiduciary duty in connection with the Proposed Transaction, which, without such aid, would not have occurred.  Among other things, ROAC provided, and Swenson Granite obtained, sensitive non-public information concerning ROAC's operations during the period leading up to the Merger Agreement and thus had unfair advantages which enabled Swenson Granite to acquire the Company through an unfair process and at an unfair and inadequate price.

104.    As a result, Plaintiffs and the Class members have been and will be damaged in that they have been and will be prevented from obtaining a fair price for their ROAC shares.

105.    Unless the Proposed Transaction is enjoined by the Court, defendants will continue to breach their fiduciary duties owed to the Plaintiffs and the members of the Class, and will consummate and close the Proposed Transaction complained of and succeed in their plan described above, all to the irreparable harm of the members of the Class.

106.    Plaintiffs and the other members of the Class have no adequate remedy at law.

WHEREFORE, Plaintiffs demand judgment as follows:

(a)    declaring this action to be a proper class action and certifying Plaintiffs as the representatives of the Class;

(b)     ordering defendants to carry out their fiduciary duties to Plaintiffs and the other members of the Class, including those duties of care, loyalty, candor and fair dealing;

(c)     declaring that the defendants have committed a gross abuse of trust and have breached and are breaching their fiduciary and other duties to Plaintiffs and members of the Class;

(d)     granting preliminary and permanent injunctive relief against the consummation of the Proposed Transaction as described herein;

(e)     in the event the Proposed Transaction is consummated, rescinding the Proposed Transaction effected by defendants and/or awarding rescissory damages to the Class;

(f)     ordering defendants, jointly and severally, to account to Plaintiffs and other members of the Class for all damages suffered, if the Proposed Transaction is not enjoined and is consummated, by them as the result of the acts and transactions alleged herein, together with prejudgment interest at the maximum rate allowable by law;

(g)     awarding Plaintiffs the costs and disbursements of the action including allowances for Plaintiffs' reasonable attorneys' and experts' fees; and

(h)     granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiffs demand a trial by jury for those issues so triable.

Dated:  November 22, 2010

_____
WOLF POPPER LLP
Chet B. Waldman (admitted pro hac vice)
845 Third Avenue
New York, New York 10022
(212) 759-4600

TARRANT, GILLIES, MERRIMAN & RICHARDSON
Daniel P. Richardson
44 East State Street
P.O. Box 1440
Montpelier, Vermont 05601-1440
(T): (802) 223-1112
(F): (802) 223-6225

*Attorneys for Plaintiffs*

## VERIFICATION

I, Todd Semon, hereby, under penalty of perjury, state as follows:

I am one of the Plaintiffs in the above-captioned action.  I have read the foregoing Verified Amended Class Action Complaint (the "Verified Complaint") and authorized its filing. Based upon the investigation of my counsel, the allegations in the Verified Complaint are true to the best of my knowledge, information and belief.

DATED: 11/22/2010

_____
Todd Semon

Doc. 169458

## VERIFICATION

I, Jerome Meister, hereby, under penalty of perjury, state as follows:

I am one of the Plaintiffs in the above-captioned action. I have read the foregoing Verified Amended Class Action Complaint (the "Verified Complaint") and authorized its filing. Based upon the investigation of my counsel, the allegations in the Verified Complaint are true to the best of my knowledge, information and belief.

DATED: _11-22-10_                                     _____
                                                      Jerome Meister