**UNITED STATES DISTRICT COURT**
**DISTRICT OF VERMONT**

| | |
|---|---|
| TODD SEMON, on behalf of himself, and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ROCK OF AGES CORPORATION, SWENSON GRANITE COMPANY, LLC, GRANITE ACQUISITION, LLC, KURT M. SWENSON, JAMES L. FOX, RICHARD C. KIMBALL, DONALD LABONTE, LAURA A. PLUDE, PAMELA G. SHEIFFER, and FREDERICK E. WEBSTER JR.,<br><br>Defendants. | Case No. 5:10cv00143-CR |

**PLAINTIFF'S MOTION FOR EXPEDITED DISCOVERY**

Plaintiff, Todd Semon, respectfully moves this Court for entry of an order directing expedited discovery in this action in anticipation of filing a motion seeking a preliminary injunction against the consummation of the transaction by which Swenson Granite Company, LLC will acquire 100% ownership of Rock of Ages Corporation for $5.25 per share in cash. The grounds for this motion are as follows:

## I. PRELIMINARY STATEMENT AND RELEVANT FACTUAL BACKGROUND

Defendants, Rock of Ages Corporation ("ROAC" or the "Company"), its Board of Directors (the "Board" or the "Individual Defendants"), Swenson Granite Company, LLC, and Granite Acquisition, LLC (collectively, "Swenson Granite") have undertaken an unlawful scheme and plan to enable Kurt M. Swenson, non-executive Chairman of ROAC and the Chairman and a director of Swenson Granite Company, LLC, his brother, Kevin Swenson, and

Robert Pope ("Pope"), President and Chief Executive Officer and a director of Swenson Granite, to acquire the Company for grossly inadequate consideration and in breach of the individual defendants' fiduciary duties. Kurt Swenson, Kevin Swenson, and Pope own approximately 31% of all outstanding shares of common stock of Rock of Ages, and control approximately 71% of the voting power of all outstanding Rock of Ages shares. Proposed Verified Amended Class Action Complaint ("Am. Complt.") ¶ 1. Given the years of reliance on shareholders to bear the costs of the Company's foray into retail, the restructure of the Company through its divestment of its retail operations, the upgrade of the Company's quarrying and manufacturing facilities, the recent reduction of the Company's debt and economic downturn, the scheme to take the Company private on the cheap now that ROAC's outlook is brighter, is especially egregious. Am. Complt. ¶ 2.

Execution of the scheme began at least as early as September 19, 2009, when ROAC announced its reincorporation from Delaware to Vermont by merging the Company into its wholly-owned Vermont subsidiary. According to the Proxy Statement furnished to ROAC's shareholders in connection with the vote on whether or not to approve the reincorporation, the reincorporation had the effect of making it easier for the Swenson Granite Group (defined below) to acquire the remaining shares of ROAC that it did not own, as detailed in the Am. Complt. Additionally, as also detailed therein, the effect of said reincorporation may have been misrepresented to ROAC shareholders. Am. Complt. ¶ 3.

On October 18, 2010, ROAC announced that it had entered into a definitive merger agreement with Swenson Granite Company, LLC (the "Merger Agreement") whereby Swenson Granite Company, LLC, and its wholly owned subsidiary, Granite Acquisition, LLC will acquire 100% ownership of ROAC for $5.25 per share in cash (the "Proposed Transaction"). Am.

Compl t. ¶ 8. Kurt Swenson, Kevin Swenson, Pope, Peter Friberg, a Vice President of ROAC, and certain other members of Swenson Granite who are also shareholders of ROAC ("Swenson Granite Group") have agreed, under the terms of voting agreements with Swenson Granite, to vote all of the ROAC shares they beneficially own in favor of approval of the Merger Agreement. According to statements by Defendants, the Proposed Transaction is expected to close shortly.

Members of the Swenson Granite Group beneficially own, in the aggregate, 408,701 shares of Company Class A common stock and 2,449,793 shares of Company Class B common stock, representing approximately 81% of the total voting power of all outstanding shares of ROAC's common stock (10% more than just Kurt Swenson, Kevin Swenson, and Pope alone). Am. Compl t. ¶ 9. Under the terms of the voting agreements, Individual Defendants, Kurt Swenson and Richard Kimball, will receive Swenson Granite shares instead of cash, in contrast to the compensation received by ROAC's public shareholders. Individual Defendant, Donald Labonte, will also receive the option to purchase Swenson Granite shares, and recently retired ROAC Board member, Charles Waite (another party to the voting agreements, and ex-Board member) will also receive Swenson Granite shares instead of cash for his shares. Am. Compl t. ¶ 10.

The Proposed Transaction is unfair to the public shareholders of ROAC in both the process at which it was arrived at and the price it provides to the minority shareholders. As detailed in the Am. Compl t., the members of the Board failed to fulfill their fiduciary duties to obtain the highest price available for the Company's public shareholders. Am. Compl t. ¶ 11.

In addition to agreeing to unfair consideration and failing to maximize value for the Company's public shareholders, the Board has also failed to disclose material information that

ROAC shareholders need in order to make informed decisions as to whether to vote their shares in favor of the Proposed Transaction or not. For example, the Board failed to disclose various details as to the background of the Proposed Transaction, primarily relating to the process that led up to the Proposed Transaction, including what strategic alternatives were examined, as well as details relating to financial projections and other analyses mentioned in the preliminary proxy statement recently filed by the Company (the "Preliminary Proxy"). Am. Complt. ¶ 12.

As a result of the Individual Defendants' failure to maximize shareholder value, their other breaches of fiduciary duty, and the other defendants aiding and abetting these breaches of fiduciary duty, unless this Court grants the requested relief, Plaintiff and other public shareholders of ROAC common stock will be irreparably harmed because they will lose consideration for their shares and be forced to vote on the Proposed Transaction with insufficient information.

Given the short period of time available to Plaintiff between now and the vote on the Proposed Transaction, relief from the Court is necessary so that Plaintiff may obtain the documents and deposition testimony necessary to support the anticipated motion for a preliminary injunction. Plaintiff previously served document requests on Defendants months ago, on June 11, 2010, and the presently requested initial discovery set forth in Plaintiff's First Request for the Production of Documents Directed to All Defendants (the "Document Requests") (attached hereto as Exhibit A), is substantially similar to those requests Plaintiff previously served on Defendants. The documents that Plaintiff seeks initially in the Document Request, may be supplemented by a further request depending upon the nature of the production made by

defendants.[1]

## II. ARGUMENT

### A. Plaintiff Is Entitled To Expedited Discovery

Under Federal Rule of Civil Procedure 26, the Court has broad discretion in the management of discovery. Although a party ordinarily may not seek discovery before the parties have conferred as required by Rule 26(f), upon motion, for the convenience of the parties and witnesses and in the interest of justice, the Court may grant leave to conduct discovery prior to a conference among the parties. FRCP 26(d).

Federal courts have granted expedited discovery in circumstances similar to those present in the instant action. *See, e.g., Ryan v. Walton*, 2010 U.S. Dist. LEXIS 108618 (D.D.C. Mar. 9, 2010) (granting plaintiffs' motion for expedited discovery where plaintiff shareholders of Allied Capital Corporation challenged the acquisition of the company, alleging breaches of fiduciary duties); *Standard Inv. Chartered, Inc. v. Nat'l Ass'n of Sec. Dealers ("Standard I")*, 07 Cv. 2014 (SWK), 2007 WL 1121734 (S.D.N.Y. Apr. 11, 2007) (granting limited expedited discovery in aid of an anticipated motion to preliminarily enjoin a consolidation); *Pulse Techs., Inc. v. Dodrill*, 2006 U.S. Dist. LEXIS 88888 (E.D. Pa. Dec. 7, 2006) (granting plaintiff's motion for expedited discovery and scheduling a hearing on preliminary injunction).

Courts considering applications for expedited discovery focus on (1) whether the plaintiff has shown "good cause"; and (2) whether the discovery request is reasonable based on "the entirety of the record to date and "all the surrounding circumstances." *Ayyash v. Bank Al-*

[1] Plaintiff respectfully refers to and incorporates by reference the facts set forth in the Proposed Verified Class Action Complaint, submitted on November 22, 2010, as an Exhibit to his Motion to Amend his Complaint (Docket No. 53) for a more complete description of the facts pertinent to this motion.

*Madine*, 233 F.R.D. 325, 327 (S.D.N.Y. 2005) (*quoting Merrill Lynch, Pierce, Fenner & Smith, Inc. v. O'Connor*, 194 F.R.D. 618, 623-24 (N.D. Ill. 2000)).

"Good cause exists where the need for expedited discovery, in consideration of the administration of justice, outweighs the prejudice to the responding party. *Semitool, Inc. v. Tokyo Electron Am., Inc*. 208 F.R.D. 273, 275 (N.D. Cal. 2002). "The good cause standard may be satisfied where a party seeks a preliminary injunction." *Qwest Commc'ns Int'l, Inc*., 213 F.R.D. at 419; *see also El Pollo Loco, S.A. de C.V. v. El Pollo Loco, Inc*., 344 F. Supp. 2d 986, 991 (S.D. Tex. 2004) ("Expedited discovery [is] appropriate in cases involving preliminary injunctions or challenges to personal jurisdiction."); Advisory Committee Notes to the 1993 amendments to Rule 26(d) (Discovery before the Rule 26(f) conference "will be appropriate in some cases, such as those involving requests for a preliminary injunction or motions challenging personal jurisdiction.") *See also Advanced Portfolio Techs., Inc. v. Advanced Portfolio Techs., Ltd*., 1994 U.S. Dist. LEXIS 18457, at *7 (S.D.N.Y. Dec. 28, 1994) ("Expedited discovery is often available in cases where preliminary relief is sought."); *Fed. Express Corp. v. Fed. Expresso, Inc*., 1997 U.S. Dist. LEXIS 19144, at *6 (N.D.N.Y. 1997), *aff'd*, 201 F.3d 168 (2d Cir. 2000) ("The Federal Rules clearly contemplate the type of expedited discovery the court has permitted here pursuant to Fed. R. Civ. P. 26(d)").

Regarding reasonableness, "[f]actors commonly considered in determining the reasonableness of expedited discovery include, but are not limited to: (1) whether a preliminary injunction is pending; (2) the breadth of the discovery requests; (3) the purpose for requesting the expedited discovery; (4) the burden on the defendants to comply with the requests; and (5) how far in advance of the typical discovery process the request was made." *Disability Rights Council of Greater Wash*., 234 F.R.D. at 6 (citations omitted); *Qwest Commc'ns Int'l, Inc*., 213 F.R.D. at

419. Practically, however, a party requesting expedited discovery need only make "some showing of good cause to justify the order." *El Pollo Loco*, 344 F. Supp. 2d at 911. Courts have used the terms "good cause" and "reasonableness" interchangeably. *See, e.g., Wachovia Sec., L.L.C. v. Stanton*, 571 F. Supp. 2d 1014, 1050 (N.D. Iowa 2008) ("[I]n general, the 'good cause' standard should be applied to requests for expedited discovery, balancing the need for expedited discovery, in the administration of justice, against the prejudice to the responding party, and considering the entirety of the record to date and the reasonableness of the request in light of all of the surrounding circumstances."); *Dimension Data N. Am.*, 226 F.R.D. at 531 ("[W]here plaintiff requests expedited discovery in preparation for a preliminary injunction determination, . . . a standard based upon reasonableness or good cause, taking into account the totality of the circumstances, is more in keeping with discretion bestowed upon the court in the Federal Rules of Civil Procedure.").

Where, as here, Plaintiff has articulated a sufficiently colorable claim and has shown a sufficient possibility of threatened irreparable harm, Delaware courts, which often hear similar cases, have recognized the propriety of expedited proceedings. *See Marie Raymond Revocable Trust v. Mat Five LLC*, 2008 WL 2673341, at *3-5 (Del. Ch. June 26, 2008). In applying these standards, the Delaware Court of Chancery "traditionally has acted with a certain solicitude for plaintiffs" and "has followed the practice of erring on the side of more [expedited] hearings rather than fewer." *Giammargo v. Snapple Beverage Corp.*, 1994 WL 672698, at *2 (Del. Ch. Nov. 15, 1994). As a result, "[a] party's request to schedule an application for a preliminary injunction, and to expedite the discovery related thereto, is normally routinely granted. Exceptions to that norm are rare." *In re International Jensen Shareholders Litig.*, 1996 WL 422325, at *1 (Del. Ch. July 16, 1996). The Delaware Supreme Court has observed that

"Delaware courts are always receptive to expediting any type of litigation in the interests of affording justice to the parties." *Box v. Box*, 697 A.2d 395, 399 (Del. Supr. 1997).

**1. Expedited Discovery is Warranted**

Plaintiff's request for expedited discovery is reasonable in the present circumstances, and he has shown good cause for such discovery. To show good cause for expedited discovery, "a plaintiff must articulate a sufficiently colorable claim and show a sufficient possibility of a threatened irreparable injury …" *County of York Employees Ret. Plan v. Merrill Lynch & Co*., 2008 Del. Ch. LEXIS 162 (Del. Ch. Oct. 28, 2008). Plaintiff's allegations here are sufficiently colorable and clearly show sufficient possibility of a threatened irreparable injury.

**(i) Unfair Process**

Courts have found plaintiffs' claims sufficiently colorable and granted expedited discovery where, as here, plaintiffs asserted allegations that the process resulting in a merger transaction was unfair. *See, e.g., County of York Employees. Ret. Plan*, 2008 Del. Ch. LEXIS 162, 25-26 ("in light of the minimal threshold which the Plaintiff must cross, these claims are colorable. … deal protection devices must be viewed in the overall context; checking them off in isolation is not the proper methodology. … these provisions are suspect to an extent, and as such allow the Plaintiff to present colorable claims.") This is especially true in controlling shareholder transactions where the "entire fairness" standard of review by the Court is to be used. *See, e.g., Newell Co. v. Wm. E. Wright* Co., 500 A.2d 974, 978 (Del. Ch. 1985); *Joseph v. Shell Oil Co*., 498 A.2d 1117, 1120 (Del. Ch. 1985).

In the present case, Plaintiff's Motion for Expedited Discovery should similarly be granted so that he can present a full record regarding his claims that the Individual Defendants violated their fiduciary duties by approving the Proposed Transaction. Plaintiff has requested

preliminary and permanent injunctive relief regarding the Proposed Transaction, because absent equitable relief, Plaintiff and the Class will continue to suffer irreparable harm. Plaintiff alleges claims regarding the fairness of the process leading up to the Merger Agreement and the Proposed Transaction, including allegations that:

1) Although the Special Committee claimed to have "considered possible strategic alternatives," its process to "shop" the Company was effectively window-dressing, as the whole Board was beholden to Swenson Granite, and the Special Committee knew that no other bidder was likely to emerge due to the control of ROAC by the Swenson Granite Group. Am. Complt. ¶ 65.

2) In addition to the financial conflicts of the individual members of the Board, the financial advisor to the Special Committee, investment banking firm, Covington Associates LLC ("Covington"), was conflicted, Am. Complt. ¶¶ 66-67, and ROAC also tainted the process of reviewing, and ultimately approving, the Proposed Transaction by enlisting the Company's regular outside counsel, McLane, Graf, Raulerson & Middleton PA ("McLane") to represent the Company with respect to the Proposed Transaction Am. Complt. ¶ 68.

3) The Merger Agreement restricts the Board from soliciting alternative proposals and requires ROAC to advise Swenson Granite about any competing offers. Am. Complt. ¶ 70.

4) The Merger Agreement restricts the Board from accepting another acquisition proposal. Am. Complt. ¶ 71.

5) The Merger Agreement also contains provisions regarding termination expenses, which require ROAC to pay Swenson Granite's out-of-pocket costs and expenses incurred in

connection with the Merger Agreement, including, without limitation, the fees and disbursements of Swenson Granite's counsel, financial advisors, accountants and bankers, if the defendants cause the Company to terminate the Merger Agreement pursuant to the lawful exercise of fiduciary duties. This section, 8.2(d), is unreasonable because the costs and expenses may be substantial and are not limited in any way under the provision. Am. Complt. ¶ 73.

It is also unclear from the Preliminary Proxy whether the Special Committee had the power to adopt a shareholder rights plan, or "poison pill," whereby it could have fended off a possible tender offer by the Swenson Granite Group had the Special Committee failed to agree to a price. Absent such authority, the Special Committee's negotiating leverage would have been substantially impeded. Am. Complt. ¶ 75.

Given the strength of Plaintiff's claims, expedited discovery is warranted to support Plaintiff's application for injunctive relief, and unless enjoined by this Court, the Individual Defendants will continue to breach their fiduciary duties owed to Plaintiff and the Class, and may consummate the Proposed Transaction, which will deny Class members their fair share of ROAC's growth prospects and future value to the irreparable harm of the Class.

**(ii) Materially Inadequate Proxy Disclosures**

Plaintiff also alleges that Defendants have failed to disclose material information in its Preliminary Proxy that is necessary to allow ROAC shareholders to make a fully informed decision regarding a vote on the Proposed Transaction. Courts have also found claims sufficiently colorable to warrant expedited discovery where plaintiffs' allegations include claims regarding inadequate proxy disclosures or omissions. *County of York Employees Ret. Plan,* 2008 Del. Ch. LEXIS 162 (Plaintiff alleged "that the proxy statement contains a number of material

omissions regarding the Merger." The court granted, in part, plaintiff's motion for expedited discovery, stating that "the Court's task here is not to pass on the likelihood of ultimate success of the Plaintiff's claims, but merely to ascertain whether the Plaintiff has sufficiently articulated colorable claims. It has.") Plaintiff's disclosure claims here are sufficiently colorable to warrant expedited discovery. Among other things, Plaintiff alleges that the Preliminary Proxy omits material information in the following ways:

1) Either the representation to ROAC shareholders regarding the effect of a non-vote under Vermont law is incorrect in the 2009 Proxy used to entice ROAC shareholders to vote in favor of the reincorporation, or it is incorrect in the Preliminary Proxy for reasons detailed in the Am. Compl. *Id.* ¶ 81.
2) The fact that the amount of the "success fee" to Covington, which creates a conflict of interest since Covington will be paid more if the Proposed Transaction closes, is not disclosed is a material omission because ROAC shareholders cannot determine the severity of this conflict of interest. Moreover, even though the Special Committee's engagement letter provides that Covington would be paid $250,000 upon rendering a written opinion, whether favorable to the Proposed Transaction or not, the disclosure of this agreement misleadingly omits that Covington would likely not render a "written opinion" if such opinion was unfavorable. It is common practice that an unfavorable opinion by a financial advisor to a special committee would be reported orally and not reduced to writing, thereby allowing the bidder to increase its offer to come within a range of fairness. Thus, in reality, Covington would only earn the $250,000 payment if it issued a favorable opinion, which would then be in writing.

These omissions effectively misrepresent the severity of Covington's conflict of interest in performing its work for the Special Committee. Am. Compl. ¶ 83.

3) The Preliminary Proxy does not clearly state the specific prior services Covington completed regarding the sale of ROAC's retail division, and does not give any information about the compensation Covington received for those services. Nor is there is any information about whether Covington had previously rendered services to any other parties to the Proposed Transaction. Without these disclosures, shareholders cannot accurately assess potential conflicts Covington may have had beyond what has been disclosed elsewhere about the contingent nature of its fee. Am. Compl. ¶ 84.

4) The Preliminary Proxy also purports to describe events that led up to the execution of the Merger Agreement (i.e. the background of the Proposed Transaction). Significantly, the Special Committee claims that it undertook a process of exploring strategic alternatives for ROAC, but provides materially inadequate information about the process. Am. Compl. ¶¶ 85 – 88.

5) The Preliminary Proxy also fails to provide sufficient information regarding negotiations of the price of the Proposed Transaction. ¶¶ 89 – 90.

6) The Preliminary Proxy also contains financial projections, and the fairness opinion of Covington in connection with its report to the Special Committee is annexed to the Preliminary Proxy. However, these financial disclosures omit material information that ROAC public shareholders need in order to make an informed determination on how to vote their shares (Am. Compl. ¶ 91):

a) The disclosed projections in the Preliminary Proxy appear to reflect debt service and exclude free cash flows. Free cash flows should be included in the projections. Further, while Covington's performed a "discounted cash flow analysis of the Company's estimated after-tax free cash flows for the fiscal years 2010 to 2014 based on both the Company's management projections and its historical operations," the Preliminary Proxy fails to state whether the free cash flows used in Covington's discounted cash flow ("DCF") analysis were levered or unlevered.

b) The Preliminary Proxy discussed that "earlier projections forecast for the years 2010, 2011, 2012, 2013, 2014 and 2015" differed from the financial projections included in the Preliminary Proxy. However, the Preliminary Proxy fails to explain, or otherwise discuss, how the presented projections differed from the "earlier projections," including the reasons for such differences. The presented projections also do not disclose why projected EBIT decreases in most years, while projected net income stays approximately the same or increases.

c) Covington's opinion regarding the public companies it selected for its analysis fails to state the objective screening or exclusion criteria, such as SIC code, if any, used to determine Covington's sample.

d) Further, in the Comparable Public Companies Analysis by Covington set forth on p. 59, the Preliminary Proxy fails to state whether the pricing multiples indicated for ROAC reflect the Offer Price or ROAC's closing price on October 13, 2010. It is also unclear whether Covington explicitly included the value of ROAC's NOL tax assets in its comparable public companies analysis, and if it did not, why not.

e) In the Comparable Transactions Analysis by Covington, the Preliminary Proxy (at p. 61) states that "Covington also analyzed publicly available financial information for the following twelve selected merger and acquisition transactions completed no earlier than May 2007, involving building materials, quarrying, and death care companies (the transactions are categorized by the industry grouping of each target company)," but does not disclose other objective screening criteria, including size, it used, if any. Further, this section fails to explain why Covington did not consider transactions prior to May 2007, omits the detailed transaction pricing multiples for the comparable transaction (consistent with the presentation of the comparable public companies analysis), and does not explain whether Covington explicitly included the value of ROAC's NOL tax assets in its comparable transaction analysis.

f) In the DCF Analysis, while the Preliminary Proxy states (at p. 62) that "[t]he terminal value was computed by applying an EBITDA exit multiple of 6.0x – 8.0x," there is no detail to justify Covington's selection of such a low range of terminal multiples in light of the generally higher market-based indication from the comparable public companies analysis and the comparable transaction analysis, as well as ROAC's own, higher EBITDA multiple. Likewise, the DCF Analysis summary fails to disclose the basis for a 13% to 15% discount rate range.

g) Additionally in the DCF Analysis, while the Preliminary Proxy (at p. 62) discloses that the analysis "resulted in an illustrative range of equity values of the Company ranging from $18.823 million to $34.384 million based on a discounted cash flow analysis of the Company's projections," it does not disclose the corresponding per-share pricing indications.

Defendants' failure to disclose this material information to ROAC shareholders prevents them from making an informed decision regarding a vote on the Proposed Transaction, and thus expedited discovery is necessary so that Plaintiff can establish a complete record on which to base his motion to preliminarily enjoin the Proposed Transaction in order for complete disclosures to be made ahead of any vote thereon.

**2. Plaintiff's Proposed Discovery is Focused and Reasonable**

The requested discovery is reasonable in scope, tailored to the issues and necessary to proper consideration of Plaintiff's motion for preliminary injunction. It is directed to ensuring that ROAC accurately reveals information that rightly should have been contained in its Preliminary Proxy. ROAC has exclusive control over the relevant facts and documents. Further, as mentioned above, Plaintiff served substantially similar documents requests on defendants nearly six months ago.

## III. CONCLUSION

Plaintiff must undertake and complete discovery in connection with its application for injunctive relief, and briefing, argument and decision thereon must take place in a short period of time. Accordingly, expedited discovery is essential. Plaintiff respectfully requests that the Court enter an order expediting discovery proceedings.

Dated: November 24, 2010

/s/ Chet B. Waldman

WOLF POPPER LLP
Chet B. Waldman (admitted pro hac vice)
845 Third Avenue
New York, New York 10022
(212) 759-4600

TARRANT, GILLIES, MERRIMAN & RICHARDSON
Daniel P. Richardson
44 East State Street

P.O. Box 1440
Montpelier, Vermont 05601-1440
(T): (802) 223-1112
(F): (802) 223-6225

*Attorneys for Plaintiff Semon*